154 F.3d 173
 Esther VATHEKAN, Plaintiff-Appellant,
v.
PRINCE GEORGE'S COUNTY, Maryland; Jeffrey J. Simms,
Defendants-Appellees,
and
The City of Takoma Park, Maryland; B.L. Rich; Unknown
Officers, of the Prince George's County Police
Department; Unknown Officers, of the
City of Takoma Park Police
Department, Defendants.
 No. 96-2246.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1997.
Decided Aug. 28, 1998.
 
 ARGUED: Terrell Non Roberts, III, Roberts & Wood, Riverdale, Maryland, for Appellant. John Anthony Bielec, Associate County Attorney, Upper Marlboro, Maryland, for Appellees. ON BRIEF: Christopher A. Griffiths, Roberts & Wood, Riverdale, Maryland, for Appellant. Barbara L. Holtz, Acting County Attorney, Sean D. Wallace, Deputy County Attorney, Upper Marlboro, Maryland, for Appellees.
 Before WILKINS and MICHAEL, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 Reversed and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge WILKINS and Senior Judge BUTZNER joined.
 MICHAEL, Circuit Judge:
 
 
 1
 Esther Vathekan was mauled and disfigured by a police dog when a canine unit searched her house as she slept. She sued Corporal Jeffrey Simms, the officer conducting the search, and Prince George's County (Maryland) under 42 U.S.C. § 1983, contending that the dog's attack constituted excessive force in violation of her Fourth Amendment rights. The district court held that Vathekan was not seized under the Fourth Amendment, concluding instead that Fourteenth Amendment substantive due process standards governed the case. The court then granted summary judgment to the defendants after finding that the force used against Vathekan did not "shock the conscience" as required for a violation of substantive due process. The judgment for Simms was based on qualified immunity.
 
 
 2
 After considering Vathekan's appeal, we conclude that she properly identified the Fourth Amendment as the source of the right she alleges Simms violated. We hold that it was clearly established in 1995 that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone. We conclude that there is a factual dispute about whether Simms failed to give a warning before sending his dog into the house where Vathekan lived. This unresolved factual issue makes it impossible to grant summary judgment to Simms on qualified immunity grounds. Accordingly, we reverse the district court's grant of summary judgment to Simms. Because the district court granted summary judgment to Prince George's County on the mistaken determination that the Fourth Amendment does not apply to this case, we also reverse the summary judgment for the county. The case will be remanded for further proceedings.
 
 I.
 
 3
 In reviewing a summary judgment, we must view the facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We also must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citation omitted). Accordingly, we set forth the facts in the light most favorable to Vathekan, the nonmovant.[1]
 
 A.
 
 4
 At the time of the attack in 1995 Esther Vathekan was a private duty nurse living in Takoma Park, Maryland. She lived in a one-story house with a furnished basement at 7604 Glenside Drive. The basement unit, which had a separate door to the outside, was rented to two students, Jonathan Lopez and another man. A staircase led from the basement to Vathekan's residence on the ground floor, and a door at the top of the stairs separated the two living units. This interior door was closed but unlocked at the time of the incident on January 10, 1995.
 
 
 5
 Early in the morning of that day Vathekan returned to her home after working the night shift. She slept until noon, had something to eat, and went back to bed. At about 1:10 that afternoon Lopez returned to his basement apartment. He discovered that the door was ajar and that its glass had been broken. Lopez immediately suspected that someone had broken into his apartment, and he went to the home of Berthnell Burnett across the street. Lopez asked Burnett to call the police. Lopez himself remained outside and watched as events unfolded.
 
 
 6
 Over the next few minutes several officers from the Takoma Park Police Department arrived on the scene. These officers established a perimeter around the house at 7604 Glenside Drive. One of the officers, Sergeant Coursey, asked Lopez whether anyone should rightfully be in the house. Lopez responded, "there shouldn't be." The Takoma Park officers called for assistance from the Prince George's County canine unit, and shortly thereafter Corporal Jeffrey Simms arrived with his dog, Castro. After officers on the scene told Simms that no one was at home, Simms was ready to unleash his dog for a search of the house.
 
 
 7
 At this point, Simms should have given a loud verbal warning that he was about to release the dog. The written Standard Operating Procedures for the Prince George's County canine unit make this requirement quite clear:
 
 
 8
 A canine will not be committed until an amplified announcement has been given. This will enable innocent persons to exit the area and afford suspects an opportunity to surrender.... It will be the canine handler's responsibility to ensure that the announcement is made.
 
 
 9
 Vathekan did not hear any warning, even though the window of her bedroom was directly above where Simms stood as he was preparing to release the dog. In addition, Lopez insists that he did not hear any announcement or warning from his position just across the street.
 
 
 10
 Simms then released the dog into the house at the basement entrance. Simms followed and issued the command, "Find him!", which signaled the dog to begin the search and to bite whomever it found in the house. After first searching in the basement, the dog ran up the stairs to Vathekan's quarters and began to "use[ ] his head in an attempt to force open the door." This indicated to Simms that there was a "human presence" on the other side of the door. Simms called the dog back down the stairs because one of the rooms in the basement had not yet been cleared. As soon as Simms and the dog completed the search of the basement, the dog ran back upstairs to the closed door, stopped, and again alerted to someone's presence on the ground floor.
 
 
 11
 Simms acknowledges that "[t]here was no announcement made" after the dog alerted at the interior door. According to Lieutenant David Morris, the commander of the Prince George's County Special Operations Division, canine officers are trained to give a second warning when a dog alerts to a person's presence behind an interior door. VanNess Bogardus, Vathekan's expert, was more pointed.[2] Bogardus said:
 
 
 12
 Jeffrey Simms violated generally accepted police standards, practices and policies by failing to give a warning after Castro alerted on the door leading from the downstairs residence to Ms. Vathekan's residence. When the dog alerted, it became reasonably likely that a person was in the upstairs portion of the residence. Standard police procedure would have been to give a warning at that point in order [to] allow any such person an opportunity to surrender prior to being bitten by the dog.
 
 
 13
 Simms allowed the dog to go through the interior door into the ground floor area. Once through the door, the dog fixed on the target whose presence he had indicated to Simms moments before: that turned out to be Esther Vathekan. The dog bounded to the bed where Vathekan slept and bit into the left side of her skull. She struggled in vain to escape as the dog shook her violently. Suddenly, the dog let go of Vathekan's skull and then clamped its jaws firmly onto the right side of her face. Vathekan was now wide awake and fully conscious of the cracking sound of the bones in her face being crushed under the dog's vise-like grip. From his position across the street, Lopez could distinctly hear Vathekan's screams of terror and pain.[3]
 
 
 14
 Upon hearing those same screams, Simms went toward the bedroom. He knew from the sound that the dog was biting a female, but since "the screams are the same whether they're innocent or criminal," he still believed that the victim might be a burglar. Simms got to the bedroom within a few seconds and called off the dog. Vathekan was carried from the scene in an ambulance, and she would spend the next six days in the hospital. Vathekan suffered serious and painful injuries from this attack, including deep lacerations to her head and face, fractured facial bones, and a permanently damaged tear duct in her right eye. She still experiences pain and discomfort from the injuries. And, although she has apparently had some reconstructive surgery, her face remains scarred and disfigured.
 
 B.
 
 15
 Vathekan sued Simms and Prince George's County in the District of Maryland under 42 U.S.C. § 1983 for violations of her constitutional rights under the Fourth Amendment. She also asserted various state law claims. The case was initially submitted to a magistrate judge, who on January 6, 1996, recommended that summary judgment be denied as to the § 1983 claim. On July 15, 1996, however, the district court rejected that recommendation, holding that "[h]ere the use of canine force was objectively reasonable" for Fourth Amendment purposes. The court then granted summary judgment on the § 1983 claim in favor of Simms alone on qualified immunity grounds. Later, the district court shifted course and suggested to the parties that the dog's attack on Vathekan did not constitute a seizure under the Fourth Amendment at all. The court asked for and received briefing on whether the incident was governed instead by substantive due process standards under the Fourteenth Amendment. Thereafter, on August 22, 1996, the court granted summary judgment in favor of all defendants on the ground that the dog's attack "[did] not approach the level of shocking the conscience" required for a violation of substantive due process. See Vathekan v. Prince George's County, 935 F.Supp. 699, 701 (D.Md.1996) (internal quotation omitted). Vathekan now appeals.
 
 II.
 
 16
 Vathekan makes two arguments in support of reversing the district court's grant of summary judgment. She first argues that the district court should have applied the stricter Fourth Amendment excessive force standard to Corporal Simms's actions rather than the less stringent Fourteenth Amendment substantive due process standard. She also asserts that under the Fourth Amendment Simms's actions were objectively unreasonable under clearly established law and that he therefore is not entitled to qualified immunity. We take each of these arguments in turn.
 
 A.
 
 17
 Vathekan was attacked by a police dog that she claims was deployed in an objectively unreasonable manner to seize her. She alleges that Simms's actions violated her Fourth Amendment right to be free from excessive force during a seizure. The district court held that Vathekan had not stated a Fourth Amendment excessive force claim because she was an innocent bystander. The court found that Simms only intended for the dog to bite a burglar, and because Vathekan was not a burglar she was not the intended object of the dog's attack. Accordingly, the court concluded that Vathekan had misidentified the right she was attempting to assert. We disagree.
 
 1.
 
 18
 "[A]ll claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)(emphasis in original). This includes attacks by police dogs improperly deployed by their handlers. See Kopf v. Wing, 942 F.2d 265 (4th Cir.1991). In Kopf the police (including, coincidentally, a Prince George's County canine officer) were searching for two fleeing suspects, including the plaintiff, when a police dog alerted to their presence in a narrow passage behind a shed in the backyard of a house. The police claimed to have given a loud warning that they were about to send the dog into the passageway, but neither the plaintiff nor nearby civilian witnesses heard any warning. The police released the dog, which bit the cornered suspects several times even after they attempted to surrender. We held that these facts, viewed in the light most favorable to the plaintiff, supported a § 1983 excessive force claim based on the Fourth Amendment. See id. at 267-68 (citing Graham ). Accordingly, if Vathekan was seized by the dog, her claim of excessive force is properly evaluated under the Fourth Amendment.
 
 2.
 
 19
 A Fourth Amendment seizure occurs whenever "there is a governmental termination of freedom of movement through means intentionally applied." Brower v. County of Inyo, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (emphasis in original). The Court held in Brower that if the police purposely detain a person under the mistaken impression that he is someone else, they have seized him under the Fourth Amendment. "A seizure occurs even when an unintended person or thing is the object of the detention or taking." Id. at 596, 109 S.Ct. 1378 (citing Hill v. California, 401 U.S. 797, 802-05, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)); see also Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir.1991) ("a fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of physical restraint"); Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir.1990) (noting that "when officers mistakenly shoot an innocent victim thinking that he is the suspect they are pursuing, the seizure [i]s intended even though the target [i]s not," and Fourth Amendment applies).
 
 
 20
 By giving the command "Find him!", Simms intended the dog to find anyone in the house. It is undisputed that once that command was given, the dog would bite anyone it found. In other words, a police dog cannot discriminate between a criminal and an innocent person. Moreover, Simms admits that once the order to search is given, the dog is trained to "go in and bite someone," even if the person is asleep.
 
 
 21
 Simms knew there was a "human presence" behind the interior door before the dog went through it to the main floor. Simms believed at that time that the person behind that door might have been a burglar. By allowing the dog to pass through the interior door, Simms intended that the dog find and bite that person. The seizure of Vathekan was therefore purposeful, even if Simms would not have seized her had he known she was innocent. Cf. Brower, 489 U.S. at 596, 109 S.Ct. 1378. Since Simms intended the dog to seize Vathekan because he thought she might be a burglar, he seized her for Fourth Amendment purposes even though she turned out to be innocent. See Hill, 401 U.S. at 802-05, 91 S.Ct. 1106 (holding that arrest of innocent man in suspect's apartment is Fourth Amendment seizure).
 
 
 22
 An attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation. Because Simms deployed the dog to find, bite, and detain the person who turned out to be Vathekan, she was seized under the Fourth Amendment. Accordingly, we hold that Vathekan properly identified her claim as a Fourth Amendment excessive force claim.
 
 B.
 
 23
 This does not end the inquiry concerning the § 1983 claim against Simms, however. We note that before the district court erroneously dismissed all claims based on its determination that the Fourth Amendment did not apply, it had granted summary judgment on the § 1983 claim to Simms alone on the ground of qualified immunity. Simms continues to maintain that he is entitled to qualified immunity, even under a Fourth Amendment analysis. Accordingly, we now consider whether Simms is entitled to summary judgment on qualified immunity grounds.
 
 1.
 
 24
 In considering a claim of qualified immunity, "our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir.1998) (en banc) (citation omitted). As we discussed above, Vathekan's claim is based on her Fourth Amendment right to be free from excessive force in the course of a Fourth Amendment seizure brought about by a police dog that was deployed without a verbal warning.
 
 2.
 
 25
 We must also determine whether that right was clearly established at the time of the incident. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Wilson, 141 F.3d at 114. "[W]e must inquire whether the established contours of the [right] were sufficiently clear at the time of the attack to make it plain to reasonable officers that their actions under these particular circumstances violated" Vathekan's rights. Winfield v. Bass, 106 F.3d 525, 531 (4th Cir.1997) (en banc). A prior case holding identical conduct to be unlawful is not required. Specifically, "the exact conduct at issue need not have been held to be unlawful" so long as the unlawfulness of the conduct is manifest under existing authority. Wilson, 141 F.3d at 114. Fourth Circuit precedent is one source for determining whether the law was clearly established at the time of the alleged violation. See id.
 
 
 26
 In evaluating whether an officer is entitled to qualified immunity on an excessive force claim, the question is "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir.1994) (citation omitted). "The immunity test and the test on the merits both rely on an objective appraisal of the reasonableness of the force employed." Id. The objective reasonableness of force should be assessed "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Id.
 
 
 27
 Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context. See Kopf, 942 F.2d at 266, 268; compare Robinette v. Barnes, 854 F.2d 909, 911 (6th Cir.1988) (holding fatal attack on suspect by police dog objectively reasonable because of undisputed testimony that police shouted three warnings before releasing dog). In Kopf we held that the improper deployment of a police dog that mauls the target constitutes excessive force in violation of the Fourth Amendment. See Kopf, 942 F.2d at 268. Kopf was decided in 1991, four years before the attack on Vathekan. Accordingly, it was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment.
 
 3.
 
 28
 If the facts of this case were undisputed, we would proceed by applying the clearly established law to determine whether Simms is entitled to qualified immunity. A factual issue critical to resolution of this issue is contested, however. When resolution of a case depends on determining what actually happened, "the issue is inappropriate for resolution by summary judgment." Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir.1992). This is because "[d]isputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context." Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir.1995) (citing Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992)). Accordingly, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Id. at 359-360 (citations omitted). Here, there is a key instance where Vathekan and Simms dispute what Simms actually did in the search of Vathekan's home. This dispute of material fact is sufficient to preclude summary judgment on qualified immunity grounds.
 
 
 29
 Vathekan asserts that Simms failed to give a verbal warning before releasing the dog into the house. Simms, by contrast, says that he gave a "very loud" warning, and his fellow officers also say that they heard a warning. As we noted above, it is settled that if no warning was given at this point, Simms's actions were objectively unreasonable. In Kopf the victim and civilian witnesses said they heard no warning before the dog was released, but all of the police officers said a warning was given. We held that this dispute created a genuine issue of material fact sufficient to bar summary judgment. See Kopf, 942 F.2d at 268. Here, as in Kopf, we have a victim and a civilian witness ready to testify that they heard no warning, contradicting the account of Simms and the other officers.
 
 
 30
 Simms argues that the fact that Vathekan and Lopez swear that they "did not hear" a warning is insufficient to support a claim that no warning was given. Yet this argument directly contradicts our holding in Kopf, where the fact that civilian witnesses "heard no such warning" was enough for the plaintiffs to survive summary judgment on the issue of whether a warning was given. Kopf, 942 F.2d at 266. Furthermore, Simms's position is incompatible with the summary judgment principle that we must view the facts in the light most favorable to the nonmoving party (here, Vathekan). If a warning is not given, then a witness will not hear one. A juror could reasonably conclude that if certain witnesses did not hear a warning, then no warning was given, even if other witnesses testify to a warning.
 
 
 31
 Simms further argues that Lopez's sworn statement that he did not hear any warning should be discounted because of a statement he made to the police on the scene that could be interpreted to suggest that Lopez was too far away to hear any announcement. But a sworn statement may not be disregarded for summary judgment purposes merely because it contradicts an earlier unsworn statement. See Shockley v. City of Newport News, 997 F.2d 18, 23 (4th Cir.1993). At most, Lopez's unsworn statement creates a question about his credibility, and credibility questions are for the jury to resolve. See Rainey, 973 F.2d at 324. In addition, it is uncontradicted that Lopez was in a position to hear, and did hear, Vathekan's screams of pain as the dog attacked her. It is reasonable to conclude that if Lopez could hear Vathekan's screams, then he was also in a position to hear a loud warning from Simms, who was positioned just below Vathekan's window at the time a warning should have been given. Accordingly, at this stage Lopez's statement--that he was in a position to hear a warning and did not hear one--cannot be discounted as incredible. There is a genuine issue of fact whether Simms made a warning before releasing his dog into Vathekan's home. This factual dispute is enough to prevent the award of summary judgment on qualified immunity grounds.
 
 
 32
 The award of summary judgment to Corporal Simms is therefore reversed.
 
 III.
 
 33
 Vathekan also sued Prince George's County under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which established that municipalities and counties could be liable for constitutional deprivations under § 1983.[4] Municipal liability "is derivative of, but narrower than" the liability of individual officers. Kopf v. Wing, 942 F.2d 265, 269 (4th Cir.1991) (citing Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987)). Thus, Vathekan can prevail on her Monell claim only if Simms used excessive force against her, "and this use of force was caused by an unconstitutional custom or practice of the county." Id. Under this theory Vathekan has alleged that Prince George's County violated her civil rights by "fail[ing] to adequately train and supervise its officers in the proper use of police dogs."
 
 
 34
 At the beginning of the case, the district court bifurcated the Monell claim against the county over Vathekan's objections. The court stayed discovery against the county and postponed consideration of the Monell claim until the claim against Simms was resolved. Once the district court erroneously concluded that the Fourth Amendment did not apply to Vathekan's claim against Simms, it granted summary judgment as a matter of course to the county. See Vathekan v. Prince George's County, 935 F.Supp. 699, 701 (D.Md.1996). Because we conclude that Vathekan properly stated a Fourth Amendment claim, we must now reverse the grant of summary judgment to Prince George's County and remand for reconsideration of the Monell claim.
 
 
 35
 We note further that the district court dismissed Vathekan's state law claims pursuant to 28 U.S.C. § 1367(c)(3), which permits district courts to decline to exercise supplemental jurisdiction over related state law claims when "the district court has dismissed all claims over which it has original jurisdiction." Because Vathekan's federal claims have been reinstated, district court jurisdiction over the state law claims is restored. As a result, we also reverse the dismissal of the state law claims.
 
 IV.
 
 36
 The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.
 
 
 37
 REVERSED AND REMANDED.
 
 
 
 [1]
 The defendants dispute several of the key facts. See e.g., part II.B.3., infra
 
 
 [2]
 Bogardus is an expert in the training and use of police dogs. He was assigned to dog units in the Los Angeles County Sheriff's Department for several years, and he has trained both police dogs and their handlers for over a decade
 
 
 [3]
 The force of a police dog's bite is between 1,200 and 2,000 pounds per square inch. See Douglas U. Rosenthal, Note, When K-9s Cause Chaos--An Examination of Police Dog Policies and Their Liabilities, 11 N.Y.L. Sch. J. Hum. Rts. 279, 296 (1994)
 
 
 [4]
 These units of local government are not eligible for immunity on Monell claims. See Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (Rehnquist, C.J., for a unanimous court) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit--either absolute or qualified--under § 1983"); accord Burtnick v. McLean, 76 F.3d 611, 612-13 (4th Cir.1996)